THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHERLY LEIGH VARGAS,                          :
                                              :
            Plaintiff                         :
                                              :        3:12-CV-01215
      vs.                                     :
                                              :        (Judge MARIANI)
CAROLYN W. COLVIN, ACTING                     :
COMMISSIONER OF SOCIAL                        :
SECURITY,                                     :
                                              :
            Defendant                         :

## MEMORANDUM

### Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Cherly Leigh Vargas's claim for social security disability insurance benefits and supplemental security income benefits.

On December 9, 2008, Vargas filed protectively[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 16, 85 and 155-162.[2]  The applications were initially denied by the Bureau of Disability Determination[3] on July 16, 2009. Tr. 87-96. On September 9, 2009, Vargas requested a hearing before an administrative law judge. Tr. 99-100.  After over 10 months had

---

1.    Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.    References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on August 20, 2012.

3.    The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 88 and 93.

passed, a hearing was held on July 19, 2010. Tr. 31-84. Vargas was represented by

counsel at the hearing. Id. On September 21, 2010, the administrative law judge issued

a decision denying Vargas's applications. Tr. 16-26. As will be explained in more detail

infra the administrative law judge found that Vargas had a combination of impairments,

including polysubstance abuse, that met the requirements of a listed mental health

impairment and was presumptively disabled but that absent the substance addiction

disorder, Vargas could perform a range of sedentary work.[4]  Tr. 20-21.  On November 22,

_____

4.     The terms sedentary, light, medium, heavy and very heavy work are defined in the
regulations of the Social Security Administration as follows:

> (a) Sedentary work. Sedentary work involves lifting no more than 10
> pounds at a time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools. Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties. Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are met.

> (b) Light work. Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these
> activities. If someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting factors such
> as  loss of fine dexterity or inability to sit for long periods of time.

> (c) Medium work.  Medium work involves lifting no more than 50 pounds at
> a time with frequent lifting or carrying of objects weighing up to 25 pounds.
> If someone can do medium work, we determine that he or she can do
> sedentary and light work.

> (d) Heavy work.  Heavy work involves lifting no more than 100 pounds at a
> time with frequent lifting or carrying of objects weighing up to 50 pounds.
> If someone can do heavy work, we determine that he or she can also do
> medium, light, and sedentary work.

> (e) Very heavy work.  Very heavy work involves lifting objects weighing
> more than 100 pounds at a time with frequent lifting or carrying of objects
> weighing 50 pounds or more.  If someone can do very heavy work, we

(continued...)

2

2010, Vargas filed a request for review with the Appeals Council. Tr. 7-12. After the passage of about 18 months, the Appeals Council on May 18, 2012, concluded that there was no basis upon which to grant Vargas's request for review. Tr. 1-6. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Vargas then filed a complaint in this court on June 26, 2012. Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on November 8, 2012, when Vargas filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Vargas met the insured status requirements of the Social Security Act through March 31, 2009. Tr. 16, 19, 163 and 172. In order to establish entitlement to disability insurance benefits Vargas was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged,

---

4.    (...continued)
              determine that he or she can also do heavy, medium, light and sedentary
              work.

20 C.F.R. § 416.967.

5.    Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Vargas  was born in the United States on September 30, 1969, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1516(c) and 416.963(c). Tr.  41, 85-86, 155 and 159.

Although Vargas withdrew from school during 1985 after commencing the 10th grade, she subsequently obtained a General Equivalency Diploma (GED) in 1998 and can read, write, speak and understand the English language and perform basic mathematical function such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr.  41-42, 178, 186, 199 and 205.  In a document filed with the Social Security Administration, Vargas stated that during her primary and secondary schooling, she did not attend special education classes. Tr. 205. However, at the administrative hearing Vargas testified that she attended "special needs classes" for math. Tr. 43.  After withdrawing from school and obtaining a GED Vargas did not complete "any type of special job training, trade or vocational school." Tr. 205.

The records of the Social Security Administration reveal that Vargas had earnings in the years 1986 through 1990, 1993 through 2005, and in 2007. Tr. 164. Vargas's reported annual earnings ranged from a low of $112.39 in 1986 to a high of $24,543.13 in 2002. Id.  Vargas's total earnings during those 19 years were $102,766.49. Id.

---

6.    The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

4

Vargas's longest lasting employment was for Kunzler & Company, a food manufacture and processor, located in Lancaster, Pennsylvania, during 2000 through 2003. Tr. 65, 71-72 and 167. The position involved inspecting/quality control of products (hot dogs) sent down a conveyor line. Tr. 64-65, 72 and 193. During those four years Vargas's earnings were $18,392.66, $20,639.90, $24,543.13 and $15,374.64, respectively. Tr. 164. Vargas in the year 1999 and also in 2000 worked for Dart Container Corp, a manufacturer of foam cups and containers, located in Lancaster. Tr. 166. Vargas testified that she worked for Dart Container for six months before she went to work for Kunzler & Company. Tr. 65.

A vocational expert testified that Vargas had five types of jobs: (1) a conveyor line worker; (2) a conveyor line supervisor; (3) a packer at Dart Container; (4) a cashier; and (5) a fast food worker. Tr. 71-72. The vocational expert, however, noted that only the positions at Dart Container and Kunzler & Company amounted to substantial gainful employment activity and past relevant employment.[7] Tr. 72. The vocational expert described the conveyor line worker position as unskilled, light work; the conveyor supervisor as semi-skilled, light work; and the packer as unskilled, medium work. Id.

The record reveals that Vargas was the victim of sexual abuse by her father when she was a child, and that she has a history of alcohol and drug abuse (crack cocaine, heroin, PCP, marijuana, and methamphetamine), as well as criminal convictions. Tr. 42-43, 60, 67-69, 232, 234-235, 280 and 412. In 2008, Vargas was

---

7. Past relevant employment in the present case means work performed by Vargas during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant employment, the work must, inter alia, amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

incarcerated in the Lancaster County Prison for 4 months as the result of a parole violation. Tr. 280.  The original charge was forgery. Tr. 232 and 280.  Vargas was also convicted in 1994 of driving under the influence of alcohol and in 1996 of driving under the influence of alcohol and the possession of drug paraphernalia. Tr. 280.   In November, 2008, Vargas also reported smoking one-quarter pack of cigarettes per day for 20 years but in October 2009, was smoking ½ pack per day. Tr. 258 and 414.

Vargas in her applications for disability insurance benefits and supplemental security income benefits claimed that she became disabled on February 1, 2008. Tr.  155 and 159.   However, at the administrative hearing Vargas amended the alleged disability onset date to December 12, 2008. Tr. 34.  Vargas claims that she is unable to work because of both mental and physical impairments. Tr. 38.  The mental impairments alleged are posttraumatic stress disorder, schizophrenia, bipolar disorder, anxiety and depression. Tr. 40,  92 and 200.  The physical impairments alleged are problems associated with surgery for bilateral carpal tunnel syndrome, the pain associated with three spine surgeries, including a failed fusion, and  fibromyalgia, hepatitis C, and a sleep disorder. Tr.38 and 40.  Vargas contends that she has problems getting along with others and focusing and concentrating because of her pain. Tr. 198 and 200.   She claims that her condition has gradually worsened over time. Tr. 214.

In a "Function Report - Adult" completed by Vargas when asked to check items which are affected by her illnesses or conditions  checked the following: lifting, squatting, bending, walking, sitting, kneeling, talking, stair climbing, seeing, memory, competing tasks, concentration, and understanding.  Tr. 188.

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

6

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of

> whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to

_____

8. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

9. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

10. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal
(continued...)

his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

If the administrative law judge at one of the steps of the sequential evaluation process finds that a claimant is disabled and there is medical evidence of drug addiction or alcohol abuse, the administrative law judge must determine whether or not the drug addiction or alcoholism is a contributing factor material to the determination of disability. The Social Security regulations set forth the procedure to be followed in making this determination. Those regulations state as follows:

> (a) *General*. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

---

10. (...continued)
the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

11. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

10

> (b) *Process we will follow when we have medical evidence of your drug addiction or alcoholism.* (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
>
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
> (I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability

20 C.F.R. §§ 404.1535 and 416.935 (emphasis added).  In deciding this issue of materiality of drug or alcohol abuse, it is critically important for the administrative law judge to consider all of the psychiatric or physical impairments that remain after excluding the impairments caused by drug and alcohol abuse.  The administrative law judge must address in his decision all psychiatric and physical impairments raised by the evidence and decide whether or not each impairment is medically determinable, and if an impairment is medically determinable, whether the condition is severe or non-severe. See footnote 10, *supra*.    Furthermore, if it is not possible to disentangle the limitations attributable to drug addiction or alcoholism from those caused by the other psychiatric or physical impairments, the administrative law judge cannot conclude that substance abuse, whether drug or alcohol abuse, is a contributing factor material to the

11

determination of disability. See Brueggemann v. Barnhart, 348 F.3d 689, 693-696 (8th Cir. 2003).

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Vargas's medical records. Many of the medical records are handwritten and some are only partially legible.

The first medical record that we encounter of any importance is a report of Vargas visiting the emergency department of Lancaster General Hospital on May 3, 2007. Tr. 266-267. Her chief complaint at that time was sharp, lateral neck pain of moderate severity which radiated to an upper arm.[12] Tr. 266. When the attending medical provider reviewed Vargas's systems[13] Vargas only reported neck pain. Id. All other systems were reported to be negative. Id. It was noted that Vargas had a history of methicillin resistant Staphylococcus aureus (MRSA), Hepatitis C, Staph infection, "[s]pinal fusion for pinched nerve in the [Cervical]-spine," and opiate and cocaine abuse. Id. As for Vargas's psychiatric history it was stated that she was "no longer taking any meds." Id. The results of a physical examination were essentially normal other than Vargas had "right lateral neck tenderness and spasm" but the cervical spine itself was non-tender. Tr. 266. Also, it was stated with respect to Vargas's psychiatric condition that she was oriented to person, place and time and that she had a

---

12. The report did not identify which upper extremity was impacted.

13. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed January 11, 2014).

normal affect. Tr. 267. The diagnostic assessment was that Vargas suffered from "strain, cervical, torticollis."[14] Id. Vargas was discharged from the hospital on the same day with a prescription for the muscle relaxant Flexeril and advised to follow-up with her primary care physician. Id.

On May 27, 2007, Vargas again visited the emergency department of Lancaster General Hospital. Tr. 263-265. Her chief complaint was sharp, stabbing abdominal pain in the left lower quadrant of moderate severity and which was associated with nausea and fever. Tr. 263. She also complained of lower back discomfort which became worse after a fall three weeks prior to the visit to the emergency department and "persistent left ankle pain" which was making it difficult for her to walk. Id. It was observed that Vargas was "very histrionic and emotionally labile" and Vargas told the attending medical provider that she was "drinking alcohol to dull her pain" and was "raped last evening but does not want [it] reported." Id. When the attending medical provider reviewed Vargas's systems Vargas reported abdominal pain, nausea and back pain. Id. Vargas denied neck pain and all of her other systems were negative. Id. Vargas reported that she was consuming alcohol on a daily basis and that she had psychiatric issues but was no longer taking medications. Id. With respect to surgical history it was noted that she had "[s]pinal fusion for pinched nerve in C-spine" but no mention of any surgery with respect to her lumbar spine. Id. It was also reported that she had a history of drug abuse (cocaine and opiates). Id. The results of a physical examination were

---

14. Torticollis is defined as "abnormal contraction of the muscles of the neck, producing twisting of the neck and an unnatural position of the head." Dorland's Illustrated Medical Dictionary, 1941 (32nd Ed. 2012). The condition is also called wryneck. Id.

essentially normal other than Vargas appeared to be uncomfortable and in pain and she was tearful; she had mild tenderness in the left lower quadrant of the abdomen; and she had paraspinal tenderness in the lower back. Tr. 264. However, she had a negative straight leg raising test;[15] her deep tendon reflexes in the lower extremities were normal; she had normal range of neck motion; she had normal range of motion in the upper and lower extremities; and neurologically she had no motor or sensory deficits. Id. Also, it was stated with respect to Vargas's psychiatric condition that she was oriented to person, place and time and that she had a normal affect. Id. An x-ray of the lumbar spine revealed a prior surgical fusion at the L5-S1 level and a laminectomy[16] at the L5 level with no evidence of pedicle screw fracture or spondylolisthesis.[17] Tr. 274. A CT scan of the abdomen revealed the spinal fusion with hardware in place and no evidence of a kidney stone or urinary obstruction. Tr. 268. The diagnostic assessment was that Vargas suffered from abdominal pain and degenerative disc disease of the lumbar spine. Tr. 264. Vargas was discharged from the hospital and advised to take Mortrin or Tylenol for

---

15.     The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated-discs-straight-leg-raise (Last accessed January 15, 2013).

16.     A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. A laminectomy is the surgical removal of the lamina to take pressure off the spinal cord or spinal nerves. See Laminectomy, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/007389.htm (Last accessed January 15, 2014).

17.     Spondylolisthesis is where one vertebra of the spine slips forward over the vertebra below it. See Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012).

pain and to follow-up with her family physician if her condition did not improve in 1 to 2 days. Id.

The next record that we encounter is a report of an MRI of the lumbar spine performed on January 15, 2008. Tr. 276-277. The clinical reason given for this MRI was as follows: "38-year-old with low back pain and left lower extremity paresthesias.[18] History of prior lumbar surgery." Tr. 276. The MRI revealed "[p]ostsurgical change in the lower lumbar spine with some minimal enhancing scar but no evidence for canal stenosis or neural foraminal narrowing[19] at any level." Tr. 277. An x-ray of the lumbar spine performed on the same day revealed the "[p]revious laminectomy and pedicle fusion [at] L5-S1" but "[n]o instability with flexion or extension." Tr. 271. The x-ray did show "mild scoliosis convex to the right," "narrowing of the L5-S1 disc" and "slight narrowing of the L4-L5 disc." Id.

On January 30, 2008, Vargas had surgery performed at the Lancaster General Hospital to remove the fusion hardware in the lumbar spine. Tr. 261-262. The surgical report stated that Vargas previously had "L5-S1 fusion surgery" and that "[s]he had done reasonably well but began having increasingly severe pain following a fall" and she suffered pain "directly overlying her instrumentation." Id. The surgery was successful in removing the hardware (nuts, rods and pedicle screws) and the surgeon observed

---

18. Paresthesias is an unusual touch sensation often described as tingling, prickling or "pins and needles." See Dorland's Illustrated Medical Dictionary, 1383 (32nd Ed. 2012).

19. The foramina are openings along each side of the spine through which nerve roots exit. See Dorland's Illustrated Medical Dictionary, 729-731 (32nd Ed. 2012). Narrowing of the foramen can pinch or compress a nerve root and cause pain. Id.

after the hardware was removed that the fusion "appear[ed] to be solid, with no evidence of mobility." Tr. 262.

After the surgery to remove the fusion hardware  we do not encounter any records of follow-up appointments and the next item is a document from Lancaster County Prison indicating that Vargas was interviewed and a mental status examination performed by Paula Haigh[20] at that facility on August 4, 2008. Tr. 227-229.  The record reveals that Vargas was incarcerated at the Lancaster County Prison on July 29, 2008, because of a probation violation and released from that facility on November 29, 2008. Tr. 232 and 235.

The mental status examination performed on August 4, 2008, revealed that Vargas's appearance was appropriate and she was oriented to person, place, time and situation; her eye contact was good; she had restless and agitated motor activity, pressured speech, an anxious mood, and  a labile affect; her thought content reflected loose associations;[21] she had no hallucinations or delusions; she had no homicidal or suicidal ideations or plan;   her judgement appeared impulsive and her insight was fair; with respect to her memory it was noted that she was a poor historian; and her intelligence was noted to be average. Tr. 227.  Vargas reported a history of mental health problems, including suicide attempts, and mental health treatment, including prior outpatient drug and alcohol treatment. Tr. 228.  Vargas stated that she last used drugs and alcohol on June 1, 2008. Id.  Vargas's drug of choice was crack cocaine and she

20.    The record does not indicate what position Ms. Haigh held at the Lancaster County Prison.

21.    Loose associations is a term for a thought disorder where several subjects or ideas are raised by the patient with loosely apparent or no apparent logical connection.

16

consumed that drug and also alcoholic beverages on a daily basis. Id. She reported

spending $500 to $1000 per day on drugs and alcohol. Id. Vargas was diagnosed as

suffering from a mood disorder, not otherwise specified, and polysubstance dependence.

227-228. She was given a Global Assessment of Functioning Score (GAF) of 60[22] and it

was noted that her level of care was the general prison population. Tr. 227. While at the

Lancaster County Prison, Vargas was prescribed the drug lithium for her mental health

problems. Tr. 226 and 229. On November 14, 2008, Marc Turgeon, D.O., a physician at

the prison decreased Vargas's dosage of lithium from 600 mg every night at bedtime

(qhs) to 450 mg qhs. Tr. 229.

     After being released from the Lancaster County Prison on November 29,

2008, Vargas visited the Lancaster General Hospital on November 30, 2008, complaining

---

22. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

that she was "out of medications," "she was not given her Ultram" and she was "getting

spasm in her back" and having problems sleeping. Tr. 258.  When the attending medical

provider reviewed Vargas's systems, Vargas reported back pain but no neck pain and all

other systems were negative. Id.  Vargas reported a history of anxiety, bipolar disorder

and schizophrenia. Id.  Vargas denied drug and alcohol abuse. Id.  The report of this

visit lists Vargas's current medication as follows: Lithium Carbonate, Celexa, Cogentin

and Prolixin. Id.  The results of a physical examination were essentially normal, including

normal neck range of motion, normal inspection and range of motion of the upper and

lower extremities and normal inspection of the back with no tenderness to palpation. Tr.

259.  It was noted that Vargas was taking her psychiatric medications but not the pain

medication Ultram. Id.  Vargas was discharged from the hospital with the diagnosis of low

back pain and she was given a short-term prescription for Ultram and advised to follow-

up with her family physician in 1 to 2 days for long term care. Id.

On December 1, 2008, Vargas had an appointment at Water Street Medical

Clinic (Water Street) located in Lancaster.[23] Tr. 237 and 242.  Vargas at this appointment

complained of multiple health issues, including low back pain and bipolar disorder. Tr.

242. Vargas told the attending medical provider that she had obtained some

prescriptions from the emergency department but needed medication refills and that she

had applied for welfare.  Id.  With regard to her back pain Vargas reported that she had

no weakness, numbness or tingling and that with respect to her mental health issues she

was doing well on her current medications and she had no suicidal or homicidal

_____

23.    Water Street is a medical clinic affiliated with the Lancaster General Hospital.
The medical notes of Vargas's treatment at Water Street are on forms entitled
"Lancaster General Hospital Out-Patient Department." Tr. 237 and 242.

ideations. Id. The results of a physical examination were essentially normal other than she had positive lumbar paraspinal muscle spasms bilaterally. Id. Neurologically she was intact with normal sensory and motor function in the lower extremities bilaterally. Id. Vargas was anxious and had poor insight and judgment. Id. The diagnostic assessment was that Vargas suffered from low back pain, bipolar disorder, schizophrenia, anxiety and obsessive compulsive disorder. Id. Vargas was prescribed psychotropic and pain medications, including Celexa and Ultram and referred to a psychiatric clinic. Tr. 239 and 242.[24]

On December 2, 2008, Vargas was evaluated at Lancaster County Mental Health Services by Rebecca Sangrey, a licensed social worker holding a Master's degree in social work. Tr. 231-235. At this evaluation Vargas complained of multiple mental health issues, including paranoia, auditory and visual hallucinations, and anxiety Tr. 232 and 235. Vargas reported that she last used drugs and alcohol in May, 2008, and at that time she was using crack cocaine and alcohol on a daily basis. Id. A mental status examination of Vargas revealed that she was cooperative and alert; she had adequate eye contact and appropriate hygiene and dress; she had a history of suicidal thoughts; her thought processes were logical and relevant; she had an anxious affect; and her speech was normal in rate and volume and abundant in quantity. Tr. 232 and 235. The diagnostic impression by Ms. Sangrey was that Vargas suffered from mood disorder, not

---

24. The pages of the administrative record with respect to the December 1, 2008, appointment are out of order. The treatment note starts on page 242 and ends on page 239.

otherwise specified; rule out bipolar disorder;[25] and polysubstance dependence in early remission. Tr. 235.  Vargas was given a GAF score of 45.  Id.

On December 12, 2008, Vargas had an appointment with Robert Doe, M.D., at Water Street. Tr. 239.  Dr. Doe lists Vargas's current medications as Lithium, Flexeril, Elavil, Tramadol and Celexa, and appears then to indicate that Vargas was positive for some pain, positive for significant cravings and positive for dreams of the past. Id.  Dr. Doe's diagnostic assessment was that Vargas suffered from bipolar disorder, drug and alcohol dependence, and chronic pain and he prescribed the medications Celexa, Lithium, and Flexeril, and discontinued Elavil and prescribed in its place Trazodone. Id.   Dr. Doe also scheduled a follow-up appointment for January 9, 2009. Id.   Also, on December 12th Dr. Doe completed an employability assessment form for Vargas in which he stated that Vargas was temporarily disabled for less than 12 months from December 12, 2008, until February 12, 2009, because of bipolar disorder, drug and alcohol dependence and back pain. Tr. 243.  Dr. Doe stated that his assessment was based upon his review of medical records and Vargas's clinical history.[26]  Id.

---

25.    The "rule-out" diagnosis is used inconsistently by different physicians and psychologists and the context in which the "rule-out" diagnosis is made has to be closely scrutinized.  The "rule-out" diagnosis can have two different meanings.  It can mean that the particular condition is in fact ruled out, i.e., the patient is not suffering from the condition, but it also can mean that further information is needed to evaluate whether the patient is in fact suffering from the condition. In the present case we will assume that Ms. Sangrey could not definitely say that Vargas suffered from bipolar disorder.

26.    Dr. Doe's treatment notes are barely legible.   The handwriting on the treatment note found at page 239 of the administrative record is substantially similar to the handwriting on the employability assessment form found at page 243.  Also, the
(continued...)

Between December 22, 2008, and February 10, 2009, Vargas attended an intensive outpatient adult recovery program at Philhaven, Mt. Gretna, Pennsylvania. Tr. 280-289.  During this time Vargas had five appointments[27] with Anthony Russo, M.D., a psychiatrist and addiction specialist, and one appointment[28] with Nhien D. Nguyen, M.D., also a psychiatrist. Id.  Vargas was diagnosed as suffering from schizoaffective disorder, bipolar disorder by history, substance induced psychotic mood disorder, posttraumatic stress disorder, polysubstance abuse/dependence, pain disorder, organic mood disorder, and borderline personality disorder. Tr. 280.  The Philhaven discharge summary dated and signed by Dr. Russo on February 12, 2009, noted that Vargas suffered from the above conditions and he also gave Vargas a discharge GAF score of 40 and a highest GAF score in the last year of 40. Id.  The discharge summary also notes Vargas's "long history of mental health [problems] dating back to 1983, with multiple inpatient hospitalizations and a long history of drug/alcohol rehabilitation programs dating back to 1993" and that Vargas "is a survivor of physical, sexual, emotional abuse by step father and maternal aunt from 7 years old to 14 years old." Id.  Vargas gave as a reason for leaving the Philhaven program the need to get out of the Lancaster area because of "temptations of drug dealers." Tr. 281.  Dr. Russo, however, recommended that Vargas

---

26.  (...continued)
signature of the physician found on the treatment note at page 239 is very similar to the signature of Dr. Doe found at pages 243 and 244. We concluded that the treatment note and the medical assessment form were completed on the same day although the date on the treatment note is unclear. Tr. 239 and 243. .

27.   The dates of those appointments were as follows: 1/13/09, 1/15/09, 1/20/09, 2/5/09, and 2/10/09.

28.   The date of that appointment was 1/27/09.

pursue treatment through a dual diagnosis facility in Maryland to address both her mental health issues and her drug and alcohol addiction. Tr. 236 and 281.

In 2009 and 2010, Vargas sought periodic medical care from Twin Rose Primary Heathcare (Twin Rose) for various physical conditions, including low back pain and hepatitis C. Tr. 313-321, 386-99, 410-411 and 418-428. One Twin Rose treatment note dated February 6, 2009, indicates that she complained of low back and right shoulder pain. Tr. 315. The results of a physical examination, however, were essentially normal. Id. She had an equivocal straight leg raising test; she had a "fairly normal gait;" her deep tendon reflexes were intact; and she had normal strength in her lower extremities. Id. An MRI of Vargas's brain on the same day revealed no abnormality. Tr. 275. Also, on February 8, 2009, Vargas visited the emergency department at the Lancaster General Hospital complaining of a rash. Tr. 252. The record of this visit is notably in so far as the physical examination performed on that date was completely normal other than "scattered urticara" on her legs. Tr. 253. Vargas had normal neck range of motion and no tenderness; her cervical spine was non-tender; her back was non-tender to palpation; her upper and lower extremities were normal to inspection and she had normal range of motion; and neurologically she had no motor or sensory deficits. Tr. 253.

A urine toxicology screen performed on April 15, 2009, revealed negative results for amphetamines, barbiturates, cocaine, opiates, phencyclidine, THC and benzodiazepine. Tr. 342 and 389.

In May, 2009, Vargas was hospitalized at Lancaster General Hospital for 3 days for pneumonia. Tr. 290-292 and 296-297. While in the hospital, Vargas underwent a

22

psychiatric evaluation by Leo G. Dorozynsky, M.D. Tr. 291 and 296-297. [29] Vargas reported that her mood was stable and that she had been clean and sober for "14 months." Tr. 291. Dr. Dorozynsky opined that Vargas had a mood disorder, not otherwise specified and could not rule out bipolar disorder, otherwise specified. Tr. 297. He further stated that Vargas had a prior history of polysubstance abuse and dependence. Id. Dr. Dorozynsky gave Vargas a GAF score of 50.

On June 22, 2009, Vargas was evaluated by Barry B. Hart, Ph.D., a psychiatrist, on behalf of the Bureau of Disability Determination. Tr. 351-358. After conducting a clinical interview and a mental status examination, Dr. Hart concluded that Vargas suffered from Schizoaffective Disorder, history of polysubstance abuse, sustained full remission, and borderline personality disorder. Tr. 355. Dr. Hart could not rule out the possibility that Vargas suffered from posttraumatic stress disorder. Id. Earlier in his report he stated that Vargas "has a long history of mental health problems apparently dating from the time that she was sexually abused by her uncle and father at eight years of age" and after her mother left when she was young "she ran away from home repeatedly for up to a year at a time." Tr. 352. Dr. Hart gave Vargas a GAF score of 60 and in the concluding paragraph of his report stated that Vargas's "concentration may well be an impediment to her ability to hold down a job at the present time." Tr. 356. In a separate document completed the same day regarding Vargas's work-related mental functioning, Dr. Hart stated that Vargas was markedly limited in her ability to (1) make judgments on simple work-related decisions; (2) interact appropriately with the public,

---

29.    The pages of the administrative record are out of order. The first page of the psychiatric evaluation is page 291 and the second and third pages are 296 and 297.

supervisors, and co-workers; and (3) respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. Tr. 357.

On July 15, 2009, Mitchell Sadar, Ph.D., a psychologist, reviewed Vargas's medical records on behalf of the Bureau of Disability Determination.  Tr. 359-375.  Dr. Sadar opined that Vargas suffered from mood disorder, not otherwise specified, and polysubstance abuse in remission but that her impairments did not meet or equal the requirements of any listed mental health impairment. Tr. 366, 371 and 373.  In contrast to Dr. Hart's evaluation, Dr. Sadar found that Vargas was only moderately limited in several work-related mental functional abilities. Tr. 359-360.  Dr. Sadar also found that Vargas's impairment[30] did not prevent her "from meeting the basic mental demands of competitive work on a sustained basis." Tr. 362.

On August 27, 2009, Vargas began outpatient psychiatric treatment with Dr. Dorozynsky[31] at Lancaster Behavioral Health and from that date through May 7, 2010,

---

30.    Dr. Sadar used the singular so we assume he was only referring to the mood disorder, not otherwise specified, which is an affective disorder. Tr. 363.  On the "Psychiatric Review Technique" form he said that the medical disposition was based on Listing 12.04, Affective Disorders, and Listing 12.09, Substance Addiction Disorders, but with respect to that later listing he indicated Vargas's polysubstance abuse was in remission. Tr. 371. Dr. Hart in contrast found that Vargas suffered from Schizoaffective Disorder; a history of polysubstance abuse, sustained full remission; and borderline personality disorder and he could not rule out posttraumatic stress disorder. Tr. 355 Schizoaffective Disorder falls in a different category (Listing 12.03 Schizophrenia, Paranoid and Other Psychotic Disorders) than the mood disorder, not otherwise specified, which Dr. Sadar found as Vargas's primary impairment.   In fact Dr. Hart in his report used the DSM-IV diagnostic code 295.60 which is for schizophrenia, residual type.

31.    Dr. Dorozynsky as noted earlier in this memorandum evaluated Vargas in May, 2009, during her hospitalization for pneumonia.

had a total of nine appointments with Dr. Dorozynsky.[32] Tr. 403-407 and 486-499.  Dr. Dorozynsky's treatment notes are mostly illegible and we will not attempt to decipher them.  Id.  However, the notes of the initial evaluation on August 27, 2009, indicates that he gave Vargas a GAF score of 45 and on November 5, 2009, Dr. Dorozynsky did prepare one typewritten document which reveals that he diagnosed Vargas as suffering from mood disorder, not otherwise specified; rule out bipolar disorder, not otherwise specified; personality disorder not otherwise specified; and a history of polysubstance abuse currently in recovery.  Tr. 408.  Also, the forms utilized by Dr. Dorozynsky have some "check-box" items which we are able to interpret.  Vargas's mood was described as euthymic at three of the appointments, neutral at three, and anxious and depressed at two; her affect was mostly described as appropriate; her attention and concentration mostly within normal limits; her thought processes mostly goal-directed; her thought content and perception mostly normal although hallucination were reported; her fund of knowledge fair; and her judgment and insight fair.  Tr. 403-407 and 486-499.

On October 7, 2009, Vargas voluntarily admitted herself to the Lancaster General Hospital because she was having thoughts of committing suicide.  Tr. 412. Vargas reported that she had relapsed on alcohol two months earlier and had "used cocaine twice in the last week or so." Id.  A urine toxicology was positive for cocaine. Tr. 417.  At the time of admission to the hospital she was evaluated by a physicians assistant in the psychiatric department and given a GAF score of 40. Tr. 415. Over the course of the next several days Vargas's medications were adjusted and she was

---

32.    The appointments were on August 27, September 4, November 5 and December 4, 2009, and January 8, February 5 and 26, March 31, and May 7, 2010.

maintained on an alcohol withdrawal protocol and received psychotherapy. Tr. 417. She was discharged from the hospital on October 12, 2009, because she was requesting to be discharged and denying further suicidal thoughts. Id. At the time of discharged she was given a GAF score of 50 and instructed to return to Guadenzia for intensive outpatient psychiatric counseling. Id. Also, an appointment with Dr. Dorozynsky was scheduled for November 5, 2009, which she attended as noted above. Id.

On October 22, 2009, Vargas had an appointment with Shefali M. Shah, M.D., at Twin Rose regarding her recent psychiatric hospitalization and complaints of neck, low back and abdominal pain and symptoms of an upper respiratory infection and concerns regarding hepatitis C. Tr. 418. The report of this appointment notes that Vargas had been clean and sober since discharge from the hospital. Id. Dr. Shah noted that "[e]motionally [] she feels pretty good" and that she "denies any depression, suicidal ideations, or homicidal issues." Id. The results of a physical examination were essentially normal but Dr. Shah's diagnostic assessment was that Vargas suffered from chronic low back pain, hepatitis C, right upper quadrant pain of the abdomen, a history of drug abuse and neck pain. Id. Dr. Shah ordered blood work and other diagnostic tests, including an ultrasound of the abdomen and prescribed the pain medication Ultram. Id. The ultrasound was performed on November 3, 2009, and was "within normal limits." Tr. 440.

On December 7, 2009, Vargas had an appointment with Steve D. Chen, M.D., a gastroenterologist, regarding her hepatitis C. Tr. 509-510. After performing a clinical interview and physical examination Dr. Chen ordered further testing, and noted in the record that she had been clean and sober from drug use for two months and advised Vargas that she would have to be drug free for six months before he would start treating

26

the hepatitis C virus with interferon and ribaviran. Tr. 510. The report of this appointment noted that Vargas weighed 232 pounds.[33] Tr. 509.

Vargas had follow-up appointments with Dr. Chen on February 12 and April 19, 2010. Tr. 506-508. In the report of the appointment of February 12th Dr. Chen stated that Vargas's labs "indicated that she does have genotype 2, hepatitis C" and that "she has completely abstained from alcohol and illicit drugs." Tr. 507. At the appointment Vargas reported having some thoughts of harming herself but that she did not have a plan. Tr. 508. She also assured Dr. Chen that if she "has any inclination or plan to harm herself she [would] call either Dr. Dorozynsky or [him]." Id. In the report of the April 19th appointment Dr. Chen stated that once Vargas was cleared from a psychiatric standpoint he would proceed with interferon treatment.[34] Tr. 506.

On February 22, 2010, Vargas had an appointment with Dr. Shah at Twin Rose regarding several medical concerns including aching joints. Tr. 422. After performing a clinical interview and physical examination, Dr. Shah's diagnostic

---

33. The record reveals that Vargas is 5' 7" tall. Tr. 199. An individual of such height and weight has a body mass index of 36.3 and is considered obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc. gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (Last accessed Janaury 7, 2014). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www. Mayoclinic.com/health/obesity/DS00314 (Last accessed January 7, 2014). Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when the person has a BMI of 40 or more. With morbid obesity, the person is especially likely to have serious health problems. Id.

34. At this appointment Vargas weighed 241 pounds which based on her height of 5'7" translates to a BMI of 37.7. Tr. 506.

27

assessment included a finding of bipolar disorder, hepatitis C, gastroesophageal reflux disease and fibromyalgia. Id.

On March 19, 2010, Vargas had an MRI of the lumbar spine. Tr. 476. The report of the MRI suggests that Vargas suffered from some degenerative changes of the lumbar spine. Id. The impression of the physician interpreting the MRI was as follows: "Postsurgical changes of fusion at L5-S1. Laminectomy defect present. The thecal sac is decompressed. There is no evidence of a recurrent disc herniation. There are mild facet degenerative changes of L2-3 through L4-5. There is no pathologic enhancement postcontrast." Id.

On March 23, 2010, Vargas had an appointment with John D. Eshleman, M.D., a specialist in pulmonary medicine regarding sleep problems and tiredness. Tr. 424-426. After conducting a clinical interview and a physical examination, Dr. Eshelman's diagnostic impression was "multiple psychiatric issues with ongoing varying depression," obesity, cigarette addiction, fibromyalgia, chronic back pain after surgeries and a sleep disorder which may be complex in nature. Tr. 425. Dr. Eshelman ordered a polysomnogram (sleep study) which was performed in April and in a letter dated April 29, 2010, stated that the sleep study did not document any sleep disturbance at night. Tr. 429.

**Discussion**

Vargas's main argument is that the administrative law judge erred when he found that Vargas did not have disabling symptoms during the periods when she was clean and sober. She also argues that the administrative law judge erred when he failed to appropriately consider the opinions of treating physicians regarding the nature and

28

severity of Vargas's impairments.   We have thoroughly reviewed the record in this case which consists of 565 pages and find substantial merit in Vargas's arguments

The administrative law judge at step one found that Vargas has not engaged in substantial gainful activity since December 12, 2008, the amended alleged onset date. Tr. 19.

At step two, the administrative law judge found that Vargas suffers from the following severe impairments: "status/post spinal surgery, hepatitis C infection, mood disorder [not otherwise specified] and poly-substance abuse[.]" Id.

At step three, the administrative law judge found that Vargas's impairments met the criteria of Listing 12.04, Affective Disorders,  and Listing 12.09, Substance Addiction Disorders. Because the administrative law judge found that Vargas was disabled at step 3, the administrative law judge was required to follow the procedure set forth in 20 C.F.R. §§ 404.1535 and 416.935 referred to earlier in this memorandum. Most importantly, the administrative law judge had to determine which of Vargas's psychiatric and physical conditions remained after Vargas stopped using drugs/alcohol and then determine whether those remaining conditions were disabling.

The only severe mental or psychiatric condition which the administrative law judge found that Vargas suffered from was a mood disorder and the only severe physical conditions were status/post spinal surgery and hepatitis C. Tr. 19. The medical records reveal, however,  that Vargas was diagnosed with some other physical and psychiatric conditions.  As revealed by our thorough review of the record, Vargas was diagnosed by treating physicians with schizophrenia, anxiety, obsessive compulsive disorder,

29

schizoaffective disorder, posttraumatic stress disorder, an organic mood disorder,[35] and borderline personality disorder.  As for physical conditions, Vargas was diagnosed with obesity, fibromyalgia and gastroesophageal reflux disease.

As noted in footnote 9, *supra*, all medically determinable impairments, severe and non-severe, are to be considered in the subsequent steps of the sequential evaluation process.  The failure of the administrative law judge to find the above conditions  as medically determinable impairments, or give an adequate explanation for discounting them, makes the subsequent steps of the sequential evaluation process defective.  It  makes the administrative law judge's analysis under 20 C.F.R. §§ 404.1535 and 416.935 relating to the materiality of Vargas's substance abuse defective.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.

Robert D. Mariani
United States District Judge

Date: January 21, 2014

---

35.    An organic mood disorder is in a different category than a mood disorder, not otherwise specified.  It falls under Listing 12.02, Organic Mood Disorders.